**HOPPER RESOURCES, INC.,
Construction Division,
Appellant,**

v.

**Wendell WEBSTER, Appellee.**

**No. 82A05–0706–CV–309.**

Court of Appeals of Indiana.

Dec. 27, 2007.

Rehearing Denied Feb. 14, 2008.

Robert R. Faulkner, Evansville, IN, Attorney for Appellant.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Hopper Resources, Inc., Construction Division ("Hopper"), appeals the trial court's order denying judgment to Hopper on its claim asserted against Wendell Webster in a complaint seeking the foreclosure of a mechanic's lien and additional damages.

We affirm.

### ISSUE

Whether the trial court erred in denying judgment to Hopper.

### FACTS

John Shamo is a geologist and president of Hopper Resources, Inc., which undertakes construction projects through its Construction Division. Shamo learned that Wendell Webster wanted to have an addition built on his home. After meeting with Webster, Shamo presented Webster with a proposal dated September 27, 2003, from "Hopper Construction, Inc., A Division of Hopper Resources, Inc.," as "Contractor," to "furnish all equipment, material and labor necessary" to add a finished bathroom, pour a concrete patio adjoining the finished bathroom and the back of Webster's house, and extend the house roof over both. (Ex. 7). The total cost for the proposed work was $15,900.00. The proposal was signed by Shamo, as President; and reflects that on October 8, 2003, Webster signed his "acceptance of proposal" and "authorized" Hopper "to do the work as specified." *Id.* Webster gave Shamo $8,000.00 as a down payment.

Hopper directed John Claspell, Tony Dorris, and James Clark to perform the contracted project at Webster's home. "Half way [sic] through the project, Mr. Webster requested that the room [added for the bathroom] be divided and an exterior bathroom access" be installed, such that the addition would also contain a half-bath that could be reached from the newly poured adjoining patio. (Tr. 29). An "addendum" from Hopper, dated November 3, 2003, proposed to "furnish all equipment, materials and labor necessary to" add a wall, and install and finish the requested half-bath for an additional cost of $2,100.00. (Ex. 11). Webster signed his acceptance on November 5, 2003.

Sometime thereafter, Shamo learned that there had been no building permit obtained for the work being done at Webster's home. On November 25, 2003, Shamo went to the Building Commission office and obtained an Improvement Location Permit for the addition of a bathroom and a porch to Webster's residence. Shamo completed a "Homeowner Affidavit" stating that "Wendel [sic] Webster" thereby swore that "either [he] or a member of [his] immediate family" would "perform the ... work" of adding the room and porch at his residence, "for which Building Permit # 106771E" was being issued, and that he would *not* be "subcontracting out any of the work" thereon. (Ex. A). Shamo signed Webster's name on the affidavit. The Commission then issued to "applicant Wendel [sic] Webster" building permit # 106771E authorizing the "bathroom & porch addition" at Webster's residence. (Ex. 10). The permit in Webster's name for the work at the residence was thereafter posted on the site.

The Hopper workers proceeded to complete most of the work specified in the contracts. According to John Claspell, on March 10, 2004 (Shamo believed it was at a later date in March but could not identify an exact date), he and other Hopper workers went to the Webster home to install a vapor barrier and pea gravel under the

addition as ordered by "Code Enforcement" to "bring everything into [C]ode." (Tr. 32, 25). Claspell testified that the workers were told that Webster wanted them off the property and not to return.

On April 19, 2004, Shamo sent Webster an invoice from Hopper demanding $7,500.00 in payment for the work completed. On May 13, 2004, Shamo signed and recorded a notice asserting Hopper's entitlement to a lien of $7,500.00 for Hopper's "labor or . . . materials or machinery for improvements to" Webster's property, and that Hopper "performed labor on the 23rd day of March, 2004." (Ex. 15).

On October 19, 2004, Hopper filed a complaint on mechanic's lien, asserting that Webster had refused to pay $7,500.00 for home improvements and seeking judgment of foreclosure of the mechanic's lien in the amount of $7,500.00, plus pre-judgment interest, attorney fees, and costs. On December 9, 2004, Webster filed an answer that also asserted the affirmative defense of "fraud." (App.14). On August 31, 2005, Webster filed a counter-claim, asserting Hopper's breach of contract—by performing "unworkmanlike" and "inferior" work that "need[ed] to be razed" and rebuilt. (App.16). On September 8, 2005, Hopper filed a motion to strike both Webster's counterclaim and affirmative defense. Hopper asserted that the counterclaim was untimely, and was filed without leave of the court; and that the affirmative defense failed to comply with Indiana Trial Rule 9(B)'s requirement that the circumstances constituting fraud be specifically pled. On January 13, 2006, the trial court ruled that Webster would be allowed to file a more specific pleading of his affirmative defense. On January 24, 2006, Webster filed a more specific affirmative defense, asserting that Hopper had "held [it]self out to be a licensed and bonded contractor," that Hopper obtained a building permit by "pull[ing] a homeowner's permit" and "forg[ing] [Webster]'s name on the homeowner's affidavit," and that Hopper was "not a licensed and bonded contractor and his [sic] forging of [Webster]'s name on an affidavit constituted fraud." (App.24).

At the outset of trial on February 8, 2007, the motion to strike Webster's counterclaim was discussed. The trial court ruled that the late filed counterclaim was denied and stated, "[T]here is no Counterclaim." (Tr. 58). Hopper then presented its case, with Claspell and Shamo as the only witnesses. Webster did not call witnesses but did introduce as an exhibit the Homeowner Affidavit (during its cross examination of Shamo). On May 9, 2007, the trial court issued its judgment order, which includes *sua sponte* findings and conclusions. Therein, the trial court found *inter alia* that "a lawful permit was a necessary condition precedent to" Hopper's performance of work "and any recovery for the value thereof"; that because Hopper "had no legal permit to perform the work" on Webster's residence, Webster "was justified in refusing to allow" Hopper's workers "to return to the job site and perform any further illegal operations"; and that Hopper could "not benefit from its/his own wrongdoing." (App.37). The trial court concluded that Hopper was not "entitled to recover any further compensatory damages" and entered "final judgment against [Hopper] on [Hopper]'s claim." *Id.*

### DECISION

We note at the outset, that Webster has not filed a brief in response to Hopper's appeal. When the appellee does not file a brief, the "appellant may prevail by establishing a *prima facie* case of error." *Trinity Homes, LLC v. Fang,* 848 N.E.2d 1065, 1068 (Ind.2006). *Prima facie*

error in this context is defined as, "at first sight, on first appearance, or on the face of it." *Id.*

The standard for the appellate review of claims tried to the bench provides that the reviewing court shall not set aside the judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. *Bennett v. Broderick,* 858 N.E.2d 1044, 1047 (Ind.Ct. App.2006), *trans. denied.* In determining whether a judgment is clearly erroneous, we will not reweigh the evidence or determine the credibility of witnesses but will consider only the evidence that supports the judgment and the reasonable inferences to be drawn from that evidence. *Id.* at 1048. Here, Hopper bore the burden of proof on its complaint at trial and did not prevail; therefore, it appeals from a negative judgment. *Id.* When a party appeals from a negative judgment, it must demonstrate that the evidence points unerringly to a conclusion different from that reached by the trial court. *Id.* Further, when the trial court enters findings of fact and conclusions of law under Indiana Trial Rule 52(A), the reviewing court may only reverse if the findings or conclusions are clearly erroneous. *Butterfield v. Constantine,* 864 N.E.2d 414, 417 (Ind.Ct.App. 2007). The trial court's judgment is clearly erroneous only if its findings of fact do not support its conclusions or its conclusions do not support its judgment. *Id.* However, when, as here, the trial court enters findings *sua sponte,* the specific findings control only the issues they cover, while a general judgment standard applies to any issue not found by the court. *Id.*

We begin with the observation that Hopper's action—which was styled "Complaint to Foreclose Mechanic's Lien," (App.9)— sought relief in equity. *See Brighton v. White,* 128 Ind. 320, 27 N.E. 620, 621 (Ind.1891) ("where a lien upon real estate is to be foreclosed the equity power of the court is called into exercise"). Hence, we begin by citing some "maxims of equity." 12 I.L.E. Equity (2001).

First, "one who comes into equity must come with clean hands"; a principle that denies "relief to one whose conduct concerning the matter in controversy has been fraudulent, illegal, or unconscionable" as to another such that the other party is harmed. *Id.* at § 24; *see also Traylor v. By–Pass 46 Steak House, Inc.,* 259 Ind. 224, 285 N.E.2d 820, 822 (1972) (citing *Ferguson v. Boyd,* 169 Ind. 537, 81 N.E. 71 (1907)). In application, this principle "means that one who seeks relief in a court of equity must be free of wrongdoing in the matter before the court." *Community Care Centers, Inc. v. Sullivan,* 701 N.E.2d 1234, 1242 (Ind.Ct.App.1998), *trans. denied.*

Another maxim provides that "whomever seeks equity must do equity"; a principle whereby "relief which involves perpetration of an injustice will be denied." 12 I.L.E. *Equity* § 25. Thus, "he who would invoke the aid of a court of equity 'must show that he has done equity to him of whom he complains.' " *Shaw v. Meyer– Kiser Bank,* 199 Ind. 687, 156 N.E. 552, 554 (1927) (citations omitted).

Yet another maxim provides that "equity follows the law," 12 I.L.E. *Equity* § 22. In application, this means that "an equitable right cannot be founded on a violation of law." *Noble v. Davison,* 177 Ind. 19, 96 N.E. 325, 330 (1911).

The trial court found Hopper "obtained the requisite building permit by applying for and obtaining a homeowner's permit"; that the application therefor was a "Homeowner's Affidavit" on which Shamo signed Webster's name as homeowner; and this affidavit led to the Building Commission-

er's issuance of "the requisite permit for performing the work in question." (App.36, 37). The trial court concluded that a "lawful permit was a condition precedent" to Hopper's "performance of work and any recovery for the value thereof"; that Hopper could "not benefit from its/his own wrongdoing"; and that Hopper "had no valid permit to perform the work in question." (App.36, 37).

■■■ Hopper did not introduce into evidence, and in its arguments to the trial court it did not reference, the requirements of the Evansville Zoning Ordinance concerning building permits. However, the contents of the exhibits introduced support the inference that a building permit is a prerequisite for work such as the addition to Webster's house, and that only a homeowner may obtain a permit based on a Homeowner's Affidavit.[1] The Affidavit states that the homeowner or an immediate family member will perform the work on the residence in which the homeowner resides. The Affidavit also includes a requirement that the homeowner disclose the "subcontracting out of any work outlined in the permit issued to [the homeowner]," and further states in bold print that "all subcontractors must be licensed in Vanderburgh County." (Ex. A). Moreover, Shamo admitted that he was the person who went to the Building Commission office and *signed Webster's name on the Homeowner Affidavit.*

Thus, the evidence supports the trial court's findings that a building permit was necessary to perform the work, that the permit obtained was one issued based on a Homeowner Affidavit signed by Shamo—not Webster, the homeowner. Accordingly, the trial court's conclusion that Hopper had no valid permit to perform the work

on Webster's residence is supported by the findings. Moreover, given that Hopper's complaint sought relief based on the trial court's equity jurisdiction, and the trial court's express conclusion that Hopper could not profit from its own wrongdoing, the trial court's judgment denying relief to Hopper is not clearly erroneous.

Hopper presents a series of challenges to the trial court judgment, but all seek to persuade us to reverse the trial court's judgment and remand for judgment in favor of Hopper on its claim to foreclose mechanic's lien or breach of contract. However, we find those arguments unavailing.

Hopper argues that the trial court committed reversible error "in failing to apply an adverse inference against Webster based upon his failure to testify and failure to call any witnesses." Hopper's Br. at 9. However, Hopper presents no authority for the proposition that such shifts the burden of proof. As the plaintiff, Hopper bore the burden of proof: to establish its claim by a preponderance of the evidence. The trial court concluded that it had failed to satisfy its burden, and we agree.

Hopper next argues that the evidence does not support the trial court's "conclusion that the work was being performed illegality [sic]," and that even if that were so, recovery may be had. *Id.* We have already found that the evidence supports the trial court's findings and conclusion that the addition to Webster's house required a building permit, and that the permit Shamo obtained for Hopper was not a valid permit, *i.e.*, the work was being performed illegally. Hopper cites *Phend v. Midwest Engineering and Equip. Co.,* 93 Ind.App. 165, 177 N.E. 879 (1931), and

---

1. The Affidavit refers to provisions of "Article 15.3140 of the Vanderburgh County Building Code or Article 15.150.134 of the Municipal Code of Evansville" regarding the consequences "if the inspector should find work in violation of the Code." (Ex. A).

*Drost v. Professional Bldg. Serv. Corp.,* 153 Ind.App. 273, 286 N.E.2d 846 (1972), for the proposition that there may be recovery on a contract performed in a manner not allowed by law. However, such authority does not establish error by the trial court here, where the matter is within equity jurisdiction and the facts establish the failure of Hopper's actions to meet the standards of equity.

Hopper cites *Greenhaven Corp. v. Hutchcraft & Assocs., Inc.,* 463 N.E.2d 283 (Ind.Ct.App.1984), for the proposition that recovery may be had on a contract containing specifics not in compliance with local building codes. However, in *Greenhaven,* the parties had agreed as to the nonconforming code matter. There was no evidence that Webster agreed that the construction need not meet Code requirements.

Throughout its brief, Hopper argues that Shamo's signature of Webster's name was with Webster's acquiescence and at Webster's request. However, the credibility of witnesses is a matter for the trial court. *See Bennett,* 858 N.E.2d at 1048. Further, the validity of the Homeowner Affidavit rests on its execution in compliance with its own terms, *i.e.,* that it is executed by "the [o]wner" of the residence to be improved. (Ex. A). Finally, we have found that if parties bear "equal fault" in an "illegal contract," such as Shamo and Webster agreeing that Shamo would sign an affidavit which not only stated on its face that it was being signed by Webster but also that Webster would perform work that had been contracted to be performed by Hopper, "justice would require that we left the parties where we found them, even where [the one party] had fully performed." Monsignor Bernard P. Sheridan *Counsel No. 6138 Knights of Columbus v. Bargersville State Bank,* 620 N.E.2d 732, 735 n. 2 (Ind.Ct.App.1993).

This result is exactly that obtained by the trial court's judgment here.

Hopper also argues that the trial court erred in finding that Hopper could not recover under the contract "based upon the principle of illegality" because Webster failed to expressly plead "illegality" as an affirmative defense. Hopper's Br. at 16. We again return to the fact that by the nature of its complaint, Hopper sought equitable relief and that it bore the burden of proving its entitlement to relief. Therefore, this argument fails.

In a similar vein, Hopper argues that Webster "failed to meet his burden of proof on his affirmative defense of fraud" by not establishing all of the elements of fraud. *Id.* at 17. *Inter alia,* he asserts the lack of any "intent to deceive" on the part of Shamo, citing Shamo's testimony that the staff of the Building Commission office were aware "that he was not Wendell Webster but John Shamo" and "directed" him "to execute the homeowner's affidavit on behalf of Mr. Webster" and to sign Webster's name. *Id.* at 19. Again, we note that whether this testimony was credible was a matter for the trial court. *Bennett,* 858 N.E.2d at 1048. Moreover, Shamo's signing of Webster's name on an affidavit—*swearing* that he was Webster, the owner of the residence to be improved, and that he personally or a member of his immediate family would perform the work and *not* subcontract it out—would support the reasonable inference that this conduct was a fraud upon the Building Commission.

Next, Hopper argues that the evidence fails to support the trial court's finding that Hopper's "work was performed in a defective manner and caused the Building Inspector to require additional corrective work." Hopper's Br. at 22. As recounted in FACTS, Hopper's workers were at Webster's residence in mid-March to in-

stall a vapor barrier and pea gravel under the addition as ordered by "Code Enforcement" to "bring everything into [C]ode." (Tr. 32.25). This evidence supports the reasonable inference that construction work which fails to meet the construction code is defective work.

Hopper argues that he "is entitled to recover on the mechanic's lien" because it "substantially conforme[ed] with statutory requirements." Hopper's Br. at 24. Hopper cites *Premier Investments v. Suites of America*, 644 N.E.2d 124, 130 (Ind.1994), for the proposition that "the purpose of mechanic's lien laws is to prevent the inequity of a property owner enjoying the benefits of the labor and materials furnished by others without recompense." That said, the quotation itself alludes to the matter being one of equity. We have already determined that the trial court's judgment comports with application of the law of equity.

 Next, Hopper argues that it "was entitled to recover on breach of contract," citing "unrefuted evidence" that it "was owed and ha[d] incurred damages" in the amount of $7,500.00 "as a result of Webster breaching the parties' contract by running Hopper off the job and refusing to pay." Hopper's Br. at 29, 30. The evidence was that Webster refused to allow further work by Webster after the inspector found that the work failed to comply with Code. The Homeowner Affidavit expressly provides that "if the Inspector should find the work in the violation of the Code, then [the homeowner] shall employ a master installer of the required trade or craft to change, alter, or repair the work that is in violation." (Ex. A). Hopper offered no evidence to establish that it held such credentials. The only evidence as to licensing was Shamo's testimony that on other projects, Hopper had "worked under somebody else's license ... many times."

(Tr. 53). Absent a showing that Hopper held credentials to perform the corrective work required by the Homeowner Affidavit, the circumstances here did not require that Webster allow Hopper workers to perform further work. Therefore, Hopper's breach of contract claims must fail.

Affirmed.

MAY, J., and CRONE, J., concur.