# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 25 2018, 11:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

John Pinnow
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Joshua Cole Smith,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

May 25, 2018

Court of Appeals Case No.
18A-PC-73

Appeal from the Montgomery
Circuit Court

The Honorable Harry Siamas,
Judge

Trial Court Cause No.
54C01-1511-PC-3697

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, Joshua Smith (Smith) appeals the post-conviction court's denial of his petition for post-conviction relief.

We affirm.

## ISSUE

Smith presents one issue on appeal, which we restate as: Whether the post-conviction court properly denied Smith's petition for post-conviction relief, where Smith had at first been mistakenly released from the Indiana Department of Correction (DOC) and then reincarcerated to serve his outstanding executed sentence.

## FACTS AND PROCEDURAL HISTORY

On May 9, 2001, Smith was convicted in Florida of armed burglary of dwelling with a firearm, a 1st Degree felony; and grand theft of a firearm, a 3rd Degree felony. Smith was sentenced to serve a "[S]plit sentence: 2 years Community Control followed by 4 years of probation." (Appellant's Exh. Vol. I, p. 188). On August 27, 2001, a petition to revoke Smith's probation was filed and a warrant of arrest was ordered. Smith was rearrested in March 2002, but was released on July 30, 2002, "on condition that he reports to Community Control under [the] previous conditions." (Appellant's Exh. Vol. I, p. 188). In September and October of 2002, two petitions to revoke Smith's probation were filed. Smith's pre-trial release was subsequently revoked and an arrest warrant

was ordered. By that time, Smith had already relocated to Indiana and was therefore not rearrested.

[5] On October 31, 2003, in Tippecanoe County, Indiana, in Cause Number 79D02-310-FB-00075 (FB-75), the State filed an Information, charging Smith with conspiracy to commit dealing in methamphetamine, a Class B felony; and possession of two or more chemical reagents/precursors with intent to manufacture a controlled substance, a Class D felony. Pursuant to a plea agreement, Smith pleaded guilty to the Class B felony conspiracy to commit dealing in methamphetamine, and the State dismissed the remaining Count. The trial court at that point sentenced Smith to six years in the DOC, with two years suspended to probation. On June 21, 2004, Smith was transferred from the Tippecanoe County Jail to the "New Directions Monitor House," a drug treatment facility. (Appellant's Exh. Vol. I, p. 189). On July 14, 2004, against the advice of the staff at New Directions Monitor House, Smith left the facility, and when contacted, he "confirmed that he had not made any contact with the Tippecanoe County Probation since leaving" New Directions Monitor House. (Appellant's Exh. Vol. I, p. 189). A petition to revoke Smith's probation was filed, and a warrant of arrest was ordered.

[6] On September 2, 2004, in Montgomery County Superior Court under Cause Number 54D01-040-FD-00268 (FD-268), the State filed an Information, charging Smith with four Counts of fraud, Class D felonies; and one Count of receiving stolen property, a Class D felony. On November 18, 2004, Smith failed to appear at his trial and was tried in absentia. Smith was then found

guilty only of the Class D felony receiving stolen property. The same day, a sentencing hearing was conducted and Smith was ordered to execute a one and one-half-year sentence in the DOC. That sentence was to run consecutive to Smith's six-year sentence under FB-75 in Tippecanoe County.

[7] On January 7, 2005, in Montgomery Circuit Court, the State charged Smith with multiple Counts under five Causes. In 54C01-0501-FC-00005 (FC-5), Smith was charged with one Count of conspiracy to commit theft, a Class D felony. In 54C01-0501-FC-00006 (FC-6), Smith was charged with one Count of forgery, a Class C felony; and one Count of conspiracy to commit forgery, a Class C felony. In 54C01-0501-FC-00007 (FC-7), Smith was charged two Counts of forgery, Class C felonies; one Count of conspiracy to commit forgery, a Class C felony; and one Count of attempt to commit forgery, a Class C felony. In 54C01-0501-FC-00008 (FC-8), Smith was charged with eight Counts of forgery, Class C felonies; and one Count of theft, a Class D felony. Finally, in 54C01-0501-FC-00009 (FC-9), Smith was charged with seven Counts of forgery, Class C felonies; and one Count of conspiracy to commit forgery, a Class C felony.

[8] On June 17, 2005, pursuant to an agreement, Smith pleaded guilty to Class D felony conspiracy to commit forgery in FC-5; Class C felony conspiracy to commit forgery in FC-6; Class C felony conspiracy to commit forgery in FC-7; Class C felony forgery in FC-8; and Class C felony conspiracy to commit forgery in FC-9. The State agreed to dismiss the remaining outstanding charges under each Cause Number. The trial court afterward accepted Smith's guilty

plea and sentenced Smith as follows: in FC-5, a sentence of one and one-half years; and four-year sentences on each of the Counts under FC-6, FC-7, FC-8, and FC-9. Smith's sentences were to run consecutive, for an aggregate sentence seventeen and one-half years. However, five and one-half years were suspended to probation. The plea agreement also stipulated that Smith's seventeen and one-half year sentence under the five Causes would run consecutive to the one and one-half-year sentence under FD-268. Also, Smith expressed at his sentencing hearing that he understood that his seventeen and one-half year sentence under FC-5, FC-6, FC-7, FC-8, and FC-9 would run consecutive to his six-year sentence under FB-75, and to any other sentence imposed in Florida due to his probation violation.

[9] On February 22, 2006, under FB-75, the trial court determined that Smith had violated his probation and ordered Smith to serve four years, the balance of his previously suspended sentence in Tippecanoe County. In June of 2006, Smith completed his Montgomery Superior Court sentence under FD-268. Then in September of 2007, Smith completed his sentence under FB-75.

[10] The record shows that Smith's seventeen and one-half year sentence in Montgomery Circuit Court under FC-5, FC-6, FC-7, FC-8, and FC-9, did not display on the DOC website. Instead of serving the executed portion of that sentence in Indiana, on September 13, 2007, Smith was directly transferred from the Indiana DOC to the Florida DOC to serve a four-year sentence based on a probation violation. In 2010, Smith was released from the Florida DOC and he returned to Indiana. Smith lived in Terre Haute and Crawfordsville,

Indiana, where he held various jobs in each town. Smith also lived a year in Texas working as a construction worker. In 2014, Smith fathered a son. The record shows that Smith's son has since been declared a Child In Need of Services and is currently in foster care. The Indiana Department of Child Services has also filed a petition to terminate Smith's parental rights.

[11] On July 24, 2014, in Montgomery County, the State filed an Information, charging Smith with one Count of possession of paraphernalia, a Class A misdemeanor. Smith was later sentenced to eighty-six days in Montgomery County Jail. On May 20, 2015, in Montgomery County under Cause Number 54CO1-1505-F5-001501 (F5-1501), the State filed an Information, charging Smith with driving with a suspended license, a Class A infraction; possession of methamphetamine, a Level 5 felony; possession of marijuana, a Class B misdemeanor; and for being a habitual offender. Smith entered into a plea agreement with the State and the trial court ordered the probation department to prepare a presentencing report. As a result, it was discovered that Smith had not served the executed portion of his seventeen and one-half year as sentenced in FC-5, FC-6, FC-7, FC-8, and FC-9, in Montgomery County.[1] On August 23,

---

[1] The record shows that the State filed a petition to revoke the five and one-half years of probation in FC-5, FC-6, FC-7, FC-8, and FC-9. However, the State later dismissed that petition.

2015, the DOC took custody of Smith and recommitted him to serve the executed portion of his sentence under FC-5, FC-6, FC-7, FC-8, and FC-9.[2]

[12]     On November 16, 2015, Smith, *pro se*, filed a petition for post-conviction relief, arguing, in part, that the reinstatement of the executed portion of his sentence under FC-5, FC-6, FC-7, FC-8, and FC-9, was unconstitutional due to the delay in recommitting him to serve that sentence. On November 24, 2015, the trial court appointed a public defender for Smith. On June 2, 2017, through his counsel, Smith filed an amended post-conviction relief petition which alleged that his recommitment to the Indiana DOC after he had been released from the Florida DOC, "violates the principles of equity." (Appellant's App. Vol. II, p. 36).

[13]     On December 11, 2017, the post-conviction court conducted an evidentiary hearing. During his direct examination, Smith testified that after he completed his Florida sentence in 2010, the Florida DOC issued him a "bus ticket to Terre Haute." (PCR Tr. p. 11). Smith claimed that he "didn't realize that there was an unexecuted sentence" in Indiana, because after he was directly transferred from the Tippecanoe County Jail to the Florida DOC, he thought that his seventeen and one-half year sentence under FC-5, FC-6, FC-7, FC-8, and FC-9, run concurrent with his Florida sentence. (PCR Tr. p. 11). Smith then claimed

_____

[2] Following Smith's recommitment to the DOC, Smith withdrew his plea and the State dismissed the Information.

that the reinstatement of his prior sentence under FC-5, FC-6, FC-7, FC-8, and FC-9 was inequitable

> because one[,] I have a son that was born June [23, 2014]. Right now he's in foster care and if my sentence had been executed when it properly should have I would be out there right now to take care of my son and he wouldn't be in foster care. Also, I believe I'm being held accountable for the [S]tate's negligence. I also believe that if I did anything to compromise my sentence as escape for example, I'd be held accountable by time being added to my sentence. In this case the [S]tate made the mistake so I feel like they should have some accountability, possibly and time being deducted from my sentence. Also, I feel like I haven't been given the same opportunity that every other offender in the State of Indiana has been given to execute their sentence in a fair and timely manner. I can go on all day talking about why it's not fair, but those are the main reasons.

(PCR Tr. p. 16). During Smith's cross examination, the following exchange then occurred between the State and Smith:

> [State]. You were in court when you got sentenced right?
>
> [Smith]. Yes sir.
>
> [State]. You understood you had a total sentence of seventeen and a half years?
>
> [Smith]. Yes sir.
>
> [State]. And twelve of those had to be executed?
>
> [Smith]. Yes sir.

[State].  And you were aware when you got cut loose by Florida that you hadn't done that Indiana time right?

[Smith].  I was not aware of that because and I'll explain.  I never, I did recall in my sentencing and now that I've read the transcripts I know I did agree to and I was told that the sentence would be ran [sic] consecutive with Florida, but I thought at the time I was cut loose from Florida I did not remember that and I thought that something had got ran concurrent somehow.

(PCR Tr. pp. 18-19).  On January 2, 2018, the post-conviction court issued its findings of fact and conclusions thereon, denying Smith's petition for post-conviction relief.

Smith now appeals.  Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Under the rules of post-conviction relief, the petitioner must establish the grounds for relief by a preponderance of the evidence.  Ind. Post-Conviction Rule 1, § 5; *Strowmatt v. State*, 779 N.E.2d 971, 974-75 (Ind. Ct. App. 2002).  To succeed on appeal from the denial of relief, the post-conviction petitioner must show that the evidence is without conflict and leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court.  *Id*. at 975.  The purpose of post-conviction relief is not to provide a substitute for direct appeal, but to provide a means for raising issues not known or available to the defendant at the time of the original appeal.  *Id*.  If an issue was available on direct appeal but not litigated, it is waived.  *Id*.

[16]     Where, as here, the post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we cannot affirm the judgment on any legal basis, but rather, must determine if the court's findings are sufficient to support its judgment. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings under a clearly erroneous standard. *Id*. Accordingly, we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id*.

## I. *Delayed Sentence*

[17]     At the post-conviction hearing, Smith did not seek an alteration of his executed sentence under FC-5, FC-6, FC-7, FC-8, and FC-9; rather, he asked to be discharged from incarceration because the DOC delayed five years before recommitting him to serve his seventeen and one-half year sentence. In support of his claim, Smith relied on the principles of equity articulated in *Woods v. State*, 583 N.E.2d 1211 (Ind. 1992).

[18]     In *Woods*, Woods had been released from jail while he was awaiting the resolution of his appeal. *Id*. at 1212. After Woods's conviction had been affirmed by our court and certified to the trial court, the trial court delayed five

and one-half years before ordering Woods's sentence executed. *Id*. In ordering

that Woods be discharged from incarceration, our supreme court held that:

> Through no fault of [Woods], the State delayed the commencement of his sentence for more than five and one-half (5 ½ ) years. Thus . . . the sword of Damocles dangled over the head of [Woods] for that five and one-half (5 ½) year period. We hold that the trial court in fact lost jurisdiction over appellant by reason of this undue delay and that the motion for discharge should have been granted . . . . we now hold a court loses jurisdiction if it does not act within a reasonable time after the certification of the affirmance of a conviction.
>
> * * * *
>
> the execution of the sentence in fact does violate the principles of equity and the requirements of prompt action on the part of the State in discharging its duties in criminal cases.

*Id*. at 1212-13. One of equitable factors weighed by the *Woods* court was the

fact that, during the five and one-half year delay, Woods had stayed out of

trouble, had supported his children, and had developed health problems. *Id*. at

1213.

[19] The post-conviction court in this case made a thorough analysis of *Woods* in its

conclusions of law, stating, in pertinent part,

> 20. [Smith] has the burden of establishing his grounds for relief by a preponderance of the evidence.
>
> 21. Smith does not challenge the sentence [under FC-5, FC-6, FC-7, FC-8, and FC-9 as] originally ordered. . . . . Instead, Smith

challenges his incarceration for the reason that he was released from custody mistakenly and over five years lapsed before IDOC detained and placed him back to custody. He asserts that pursuant to the holding in *Woods v State*, 583 N.E.2d 1211 (Ind. 1992), the Indiana Department of Corrections [sic] is detaining him illegally. Smith demands that the [post-conviction court] order[s] his immediate release from [the] IDOC custody so that he can begin to serve the 5 ½ year probation term . . . . . He requests discharge of the executed portion of the sentence based on undue delay in carrying out the sentence.

****

25. [Smith] argues that his circumstances are so similar to those of the [d]efendant in *Woods v State,* 583 N.E.2d 1211 (Ind. 1992) that the holding in *Woods* requires this Court to order his immediate release from IDOC custody. The defendant in *Woods* was convicted of reckless homicide. The court sentenced him to five years, two executed and three suspended. [Woods] appealed his conviction, and he remained free during the appeal process. The appellate court affirmed [Woods's] conviction but the trial court delayed ordering his commitment to the Department of Corrections [sic] for five and [one-half] years. During that time the defendant provided for his two children, had no arrests, and had developed some health problems. The Indiana Supreme reiterated that an American citizen is entitled to live without the Damocles sword dangling over his head; and that the defendant's sentence did violate the principles of equity and the requirements of prompt action on the part of the State in discharging the duties in criminal cases. The Supreme Court set aside the defendant's commitment and discharged him.

The State argues, in opposition that if the [post-conviction court] must apply principles of equity in its analysis in the lawfulness of [Smith's] IDOC detention, then the [post-conviction court] must consider whether [Smith] has clean hands. The unclean hands

doctrine demands that one who seeks relief in a court of equity must be free of wrongdoing in the matter before the court. *Galloway v. Hadley*, 881 N.E.2d 667, 678 (Ind. Ct App. 2008). The alleged wrongdoing must have an immediate and necessary relation to the matter being litigated. *Id.* For the doctrine of unclean hands to apply, the misconduct must be intentional. *Id.* The purpose of the unclean hands doctrine is to prevent a party from reaping benefits from his misconduct. *Id.* The doctrine is not favored by the courts and is applied with reluctance and scrutiny. *Id.*

Another maxim of equity provides that whomever seeks equity must do equity, a principle whereby relief which involves perpetration of an injustice will be denied. Thus, he who would invoke the aid of a court of equity must show that he has done equity to him of whom he complains.

Yet another maxim provides that equity follows the law. In application, this means that an equitable right cannot be founded on a violation of law. *Hopper Resources, Inc. v. Webster*, 878 N.E.2d 418, 422 (Ind. Ct. App. 2007).

26. The first question is whether the *Woods* court really intended to apply equitable principles in a criminal case; or when the [*Woods* court] stated that Wood's [sic] sentence did violate the principles of equity, was the [*Woods* court] really just applying a fundamental fairness standard? It isn't clear from the decision, but the [*Woods* court] does refer to principles of equity and therefore this [c]ourt must assume that it must apply principles of equity in its analysis of the issue presented by the case at bar.

27. While the facts of this case are similar to the facts in the *Woods['s]* case in many respects, there are significant differences. First, Woods challenged the inaction of the [trial court] in ordering his commitment to the DOC. [Smith] here challenges

the ability of the DOC to require him to serve his sentence after the DOC mistakenly released him from custody. It was not the DOC's inaction that caused the delay, it was the DOC's mistake (which went undetected until [Smith] committed another offense).

Secondly, and most importantly Woods was waiting for the [trial court] to order his commitment to begin his sentence. However, [Smith] was well aware that a mistake had been made by DOC. At the sentencing hearing on June 17, 2005[,] Smith stated that he understood that any sentence that the Montgomery Circuit Court ordered would be consecutive to the Montgomery [S]uperior Court sentence that he was serving at that time. In addition, Smith acknowledged during the sentencing hearing that he knew that he had a detainer pending against him from the State of Florida. Furthermore, he acknowledged that he understood that any sentence that he received from the Montgomery Circuit Court would run consecutive to any sentence that he might receive in Florida. He also stated that he had the pending case in Tippecanoe County and that he understood that any Montgomery Circuit Court sentence must be served consecutive to any Tippecanoe County sentence that he might receive. [Smith] wasn't waiting to be committed to [the] DOC [in order] to begin [his sentence under FC-5, FC-6, FC-7, FC-8, and FC-9]; he was evading that sentence. The proof is that [Smith] was well aware that he had five and a half years of probation to serve after he had served his sentences and finally was released from custody (presumably by the State of Florida). He was under a duty to report to his probation officer when he was released from custody. [Smith] never did that. It was not the duty of the probation department to find [Smith] [i]n order for [Smith] to begin his period of probation. It was [Smith's] duty to report to probation as soon as he was released. Therefore, [Smith] effectively evaded justice for over five years after his mistaken release.

Thirdly, while Woods led a law-abiding life during the five years between the hand down of the appellate court decision and the trial court's commitment of him to [the] DOC, [Smith] did not. Smith was arrested in 2014 for [p]ossession of a [s]yringe. He was in jail for two weeks. In 2014 he [] was charged with [p]ossession of [m]arijuana and received a [ninety-day] sentence. On May 15, 2015[,] [S]mith was arrested in Montgomery County and charged with [p]ossession of [m]ethamphetamine, [p]ossession of [m]arijuana and [d]riving [w]hile [s]uspended. Eventually Smith entered into a plea agreement with the State. When [the] DOC incarcerated [Smith], he withdrew his plea and the State dismissed the Information.

Based on these much different circumstances[,] the [post-conviction court] finds that the *Woods* decision does not compel the [post-conviction court] to ignore [Smith's] wrongdoing in evading justice. Smith knew that [the] IDOC mistakenly released him because he knew that he had not served the [twelve-year] executed sentence that [had been] ordered. He also knew that he was to report to probation after his release but he never did. This was a violation of his probation terms. Justice is not a game[,] but [Smith] certainly was gaming the system and evading the executed sentence that he knew he had not served.

28. The *Woods* court also held that the State is required to act promptly in discharging its duties in criminal cases. While it is clear that [the] IDOC did not promptly discharge its duties in carrying out [the sentence under FD-5, FC-6, FC-7, FC-8, and FC-9] between 2005 and 2010; it is just as clear that [the] IDOC made a mistake. [The] IDOC acted promptly to correct the mistake as soon as the mistake was discovered. All the while [Smith] was free even though he was well aware that by a stroke of luck he had never served any portion of the seventeen and [one-half] year sentence that . . .[was] ordered in 2005.

> 29. [Smith] has failed to carry out his burden of proof. His
> petition for post-conviction relief should be denied.

(Appellant's Corrected App. Vol. II, pp. 60-64).

[20] Smith now argues that the post-conviction court erroneously distinguished his case from *Woods* in Conclusion #27. He challenges the first distinguishing factor cited by the post-conviction court that unlike the defendant in *Woods*, who challenged the inaction of the trial court in ordering his recommitment to the DOC, the delay in the commencement of Smith's already imposed sentence under FC-5, FC-6, FC-7, FC-8, and FC-9, was solely on the DOC and not on the trial court. Smith claims that "[t]his is not a significant difference because the common denominator in both cases is mistakes by the court system." (Appellant's Br. p. 15). Turning to the facts of this case, unlike the defendant in *Woods*, who challenged the inaction of the trial court in ordering his recommitment to the DOC, Smith's sentence had been imposed by the trial court, and presumably due to a clerical error on the Indiana DOC website, Smith was mistakenly released to the Florida DOC prior to serving his sentence under FC-5, FC-6, FC-7, FC-8, and FC-9. Moreover, Smith's plea agreement for Causes FC-5, FC-6, FC-7, FC-8, through FC-9, stipulated that the executed portion of Smith's seventeen and one-half year sentence under the five cases would run consecutive to Smith's one and one-half-year sentence under FD-268. In addition, at the sentencing hearing for Causes FC-5, FC-6, FC-7, FC-8, through FC-9, Smith stated that he was aware that his seventeen and one-half year sentence under those five cases would run consecutive to his six-year

sentence under FB-75 and consecutive to any sentence imposed by the State of Florida due to his probation violation.

[21] Smith next argues that there was no indication from the *Woods* case that Woods "immediately surrendered himself to the trial court once he lost on appeal. Instead, [Woods] continued to live his life of freedom, worked, and supported his children. When he was ordered to surrender and serve his sentence, he moved for [a] discharge[] based on the delay in ordering his DOC commitment." (Appellant's Br. p. 15). Smith contends that he too, like Woods, is seeking "equitable relief in a manner similar to what was ordered in *Woods*. He no more gamed the system than Woods did." (Appellant's Br. p. 16). Again, we disagree. The five and one-half year delay in the recommitment of Woods was because the trial court had delayed in ordering Woods's sentence to be executed. *Woods*, 583 N.E.2d at 1213. Woods was not gaming the legal system; rather, the legal system had regrettably failed him because the trial court had delayed ordering his sentence in a timely fashion. We find that the stark contrast between Woods and Smith, is that in Smith's case, the trial court had ordered the sentence, and the delay in recommitting Smith to serving his sentence was due to a clerical mistake committed by the DOC.

[22] Lastly, as noted, it was the principles of equity that led to Woods's discharge from incarceration in the *Woods* case. One of the equitable factors weighed by the *Woods* court was that during the five and one-half year delay, Woods had stayed out of trouble, had supported his children, and had developed health problems. *Woods*, 583 N.E.2d at 1213. In the instant case, when Smith

returned to Indiana for an interim period, he avoided legal trouble and he fathered a son. However, between 2014 and 2015, Smith committed other crimes. Therefore, we find that the equitable principles that operated to effect Woods's discharge in *Woods* have not been triggered here.

[23] Smith makes an additional argument stating that the post-conviction court erroneously relied on the unclean hands doctrine in denying him relief. Specifically, Smith argues that "he was not guilty of intentional misconduct. His premature release from prison was caused by the Indiana [DOC] mistakenly releasing him . . . . Smith did not falsify records or engage in fraud to cause the error." (Appellant's Br. pp. 12-13). The unclean hands doctrine is an equitable tenet that demands one who seeks equitable relief to be free of wrong doing in the matter before the court. *Ruder v. Ohio Valley Wholesale, Inc.*, 736 N.E.2d 776, 780 (Ind. Ct. App. 2000). In addition, the alleged wrongdoing must have an immediate and necessary relation to the matter being litigated. *Id*. The purpose of the unclean hands doctrine is to prevent a party from reaping benefits from his misconduct. *Id*. at 781. To the extent that Smith claims that he is without blame as to his delayed sentence, Smith is mistaken. Smith knew he had an outstanding seventeen and one-half year sentence to serve in Indiana and he was aware that he should have surrendered to authorities in Indiana at the very least when he returned to Indiana from Florida. Even if we were to credit Smith's testimony proffered at his post-conviction hearing—that he thought that the executed portion of his sentence under FC-5, FC-6, FC-7, FC-8, and FC-9 ran concurrently with his Florida

sentence—when Smith was released from the Florida DOC, Smith had a duty to report for probation. Yet, the record shows that when Smith returned to Indiana in 2010, he did not report to the relevant probation department and that fact alone goes to prove that Smith was avoiding his Indiana sentence.

[24] The State then argues that Smith's case is more akin to our holding in *Beliles v. State*, 663 N.E. 2d 1168 (Ind. Ct. App. 1996). In *Beliles*, just like here, Beliles was convicted and sentenced under the terms of a written plea agreement on December 20, 1990. *Id*. at 1170. The parties agreed that Beliles was to receive the maximum twenty-year sentence with six years suspended. *Id*. However, an error was made in the preparation of the sentencing order, and the order stated that Beliles received a twenty-year sentence with fourteen years suspended and six years executed. *Id*. Beliles was committed to the DOC under this incorrect sentencing order. *Id*. Less than a month later, on January 18, 1991, a corrected sentencing order reflecting the actual sentence to be imposed under the plea agreement was entered by the judge *pro tem*; however, no notice of that correction was given to either Beliles or his attorney. *Id*. Moreover, no corrected abstract of the judgment was prepared nor was the corrected sentencing order/judgment forwarded to the DOC. *Id*. In 1993, based on his projected release from prison in December of 1993, Beliles was placed in a work release center. *Id*. Beliles had secured employment after his anticipated release date, and he also had made plans regarding housing and the purchase of a used car. *Id*. However, on September 1, 1993, the sitting trial judge (the successor to the judge who had presided over the trial court during the earlier proceedings in

Beliles' case) entered a new abstract of judgment reflecting Beliles's actual sentence of an executed term of fourteen years. *Id.* The DOC was notified and Beliles was picked up at the work release center, shackled, and taken to the DOC to serve the rest of his fourteen-year sentence. *Id.* We then held that

> The present case is distinguishable from *Woods* because the sword here is double-edged and cuts the other way. Woods had been free and had lived a law-abiding life during the period in which the sword hung over his head-time which he could have spent serving his sentence. On the other hand, in the present case, the "sword" which hung over Beliles' head while he was in prison properly serving his sentence consisted of the chance that the error in the sentencing order would be corrected depriving him of the windfall of a shorter executed sentence than the one he had bargained for under his plea agreement. . . . . Beliles has not shown prejudice beyond frustrated expectations. Therefore, the equitable principles that operated to effect the prisoner's discharge in *Woods* have not been triggered here.

*Id.* at 1173. Just like the defendant in *Beliles*, Smith essentially seeks a windfall from an inadvertent clerical error that failed to display his correct sentence. The intent all along was to have Smith serve the executed portion of his seventeen and one-half year sentence which was consecutive to all his other sentences in Montgomery and Tippecanoe County, as well as any sentence that Florida intended to impose. Allowing Smith to be discharged now from the DOC would create a windfall of a sentence shorter than the one he had bargained for under his plea agreement under FC-5, FC-6, FC-7, FC-8, and FC-9. While the delay in commencement of Smith's sentence is regrettable, pursuant to *Woods* and *Beliles*, Smith has not carried his burden of establishing

that he is entitled to post-conviction relief. Accordingly, we hold that the post-conviction court properly denied Smith's relief.

## CONCLUSION

[25] Based on the above, we conclude that Smith has failed to prove that his claim warrants post-conviction relief.

[26] Affirmed.

[27] May, J. and Mathias, J. concur